**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**HATTIESBURG DIVISION**

**DR. SCOTT KLINGLER**                                                    **PLAINTIFF**

**VS.**                                                    **CAUSE NO. 2:12cv150-KS-MTP**

**UNIVERSITY OF SOUTHERN MISSISSIPPI (U.S.M.);**
**DR. MARTHA SAUNDERS, INDIVIDUALLY AND**
**OFFICIALLY; DR. ROBERT LYMAN, INDIVIDUALLY**
**AND OFFICIALLY**                                                    **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the Defendants' Motion to Dismiss or, in the

Alternative, Motion for Summary Judgment [31].  Having considered the submissions of

the parties, the record and the applicable law, the Court finds that the motion is well

taken and should be granted.

**I.  BACKGROUND**

The Plaintiff Dr. Scott Klingler asserts several federal and state law claims in

relation to his former employment at the University of Southern Mississippi ("USM") in

Hattiesburg, Mississippi.  Defendant Dr. Martha Saunders was the President of USM at

all times relevant to the Complaint.  Defendant Dr. Robert Lyman was the Provost of

USM from approximately June, 2008 to November, 2011.[1]

Dr. Klingler began his employment at USM in August of 2007 as a visiting

professor.  Effective August, 2008, Dr. Klingler was retained as an Assistant Professor

of Library and Information Science at USM's School of Library and Information Science

---

[1] "The Provost is the chief academic officer and the senior university officer next to
the President."  (Faculty Handbook [39-18] at § 2.3.)

("SLIS").[2]  This was a tenure track appointment.  The tenure track at USM is typically composed of six annual contracts.  The contracts of non-tenured faculty members, including tenure track professors such as Dr. Klingler, are subject to non-renewal "for any reason."  (Faculty Handbook [39-18] at § 3.11.5, 3.11.6.)

        Most of the events central to this dispute have their origination in the fall of 2010.  Dr. Klingler was teaching an online course labeled "LIS 458/558" during this time period.  (Klingler Dep. [39-1] 55:15-56:13.)  LIS 458/558 included a "chat component" in which students "type in their comments or responses to questions or inquiries and others type their inputs back."  (Klingler Dep. [39-1] 56:9-13.)  Dr. Klingler had the ability to log out of the chat discussion, while continuing to see what students were discussing.  (*See* Klingler Dep. [39-1] 57:7-10.)  Dr. Klingler did this during a chat discussion on November 8, and one of the students referred to Dr. Klingler as "a joke" and stated that "he doesnt' [sic] prepare" after it appeared that he had left the chat room.  (Doc. No. [39-22] at p. 4.)  After the chat discussion ended, this same student sent an e-mail to Dr. Melanie J. Norton (Chair of the SLIS and Dr. Klingler's supervisor)[3] generally expressing disappointment in her classes with Dr. Klingler and specifically advising that "Dr. K rarely adds to the discussion nor corrects misinformation."  (Doc. No. [31-8].)

        On the morning of November 9, 2010, Dr. Klingler and a graduate assistant by the name of Shane Hand had certain interactions that ultimately resulted in Dr. Klingler

---

    [2] The SLIS is a division or department of USM's College of Education and Psychology.

    [3] Unless otherwise indicated, stated job titles or positions relate to the time period of the described events and may not reflect an individual's current status.

being escorted from campus by two members of USM's Police Department.  According to Mr. Hand, Dr. Klingler seemed angry and exhibited unusual behavior by cursing and sitting uncomfortably close to a female graduate assistant.  (*See* Hand Statement [32-2]; Hand Dep. [39-3] 46:19-24, 69:3-18.)  Also, Dr. Klingler had Mr. Hand review printouts of the chat logs from the LIS 458/558 class the night before, but Dr. Klingler oddly handed and took back the chat logs several times.  (*See* Hand Dep. [39-3] 38:22-39:9, 69:3-70:10.)  Mr. Hand eventually reviewed the chat logs and told Dr. Klingler that the student who referred to him as a joke "stepped over the line".  (Hand Dep. [39-3] 44:11-20).  Mr. Hand contends that Dr. Klingler then stated, "I have never shot a student and what that girl said does not bother me, but I think about it and I think about it a lot." (Hand Dep. [39-3] 71:23-72:2.)  Dr. Klingler denies making this statement.  (*See* Klingler Dep. [39-1] 49:13-50:7.)  Dr. Klingler contends that he said something to the effect that "I've never shot anybody for not giving feedback", and then stated one to three minutes later, "I've thought about it; I've thought about it a lot", which pertained to what he could have done differently as to the LIS 458/558 class the previous night.  (Klingler Dep. [39-1] 132:12-133:7.)  "They were two completely distinct statements."  (Klingler Dep. [39-1] 133:6-7.)

    Approximately one week prior to November 9, 2010, Mr. Hand, Dr. Klingler and other individuals in the SLIS department attended a program presented by USM's Chief of Police, Bob Hopkins, regarding violence on campus.  (*See* Klingler Dep. [39-1] 46:19-25, 49:2-7; Hand Dep. [39-3] 68:3-24.)  According to Mr. Hand, program attendees were "instructed to not take things as a joke, that if we were to see anything or hear anything, our job was to report it."  (Hand Dep. [39-3] 68:17-24.)  On November 9, Mr. Hand

"reported what . . . [he] heard" during his interactions with Dr. Klingler to Edmond Pace (another graduate assistant), Adrienne Patterson (Mr. Hand's immediate supervisor and Dr. Norton's administrative assistant) and Beverly Davis (the graduate secretary). (Hand Dep. [39-3] 28:19-29:20, 69:1-2.)  Ms. Patterson subsequently reported the matter to her supervisor, Dr. Norton.  (*See* Norton Dep. [39-2] 36:11-15.)

On the afternoon of November 9, a meeting was held between Dr. Norton, Dr. Lyman, Chief Hopkins, Dr. Ann Blackwell (Interim Dean of the College of Education and Psychology) and Dr. Becky Woodrick (Director of the Office of Affirmative Action) to discuss the incident involving Mr. Hand and Dr. Klingler.  Mr. Hand was brought in and questioned at one point during the meeting.  Subsequently, the decision was made to remove Dr. Klingler from campus until the matter could be further investigated.  Dr. Klingler was formally advised of this decision through a letter signed by Dr. Blackwell. The letter states in pertinent part:

> You are being placed on paid administrative leave of absence effective immediately until such time that a review can be completed regarding allegations of potential harm to others.  You are not to return to campus, have contact with any students, teach classes, or participate in any university-related activity or function until further notice from this office.

(Doc. No. [32-5].)  The letter was hand-delivered to Dr. Klingler in Dr. Blackwell's office. (*See* Klingler Dep. [39-1] 101:13-21; Norton Dep. [39-2] 52:18-54:2.)  Dr. Klingler was subsequently escorted to his vehicle in the faculty parking lot by two USM police officers.  (*See* Klingler Dep. [39-1] 101:22-102:24.)  Dr. Klingler was not handcuffed, physically touched or pushed by the officers.  However, they walked so close to him that he would have been "run over" had he not moved.  (Klingler Dep. [39-1] 118:11-15.)

Following Dr. Klingler's removal from campus, Dr. Blackwell requested that Dr.

Thomas Lipscomb (Interim Associate Dean for the College of Education and Psychology) investigate the November 9 incident and obtain Dr. Klingler's version of events.  (*See* Blackwell Dep. [39-10] 11:21-12:3; Lipscomb Dep. [39-6] 16:9-11, 34:19-21, 47:14-18.)  Dr. Blackwell charged Dr. Lipscomb with this task because he had no prior knowledge of the incident.  (*See* Blackwell Dep. [39-10] 12:4-12.)  Dr. Lipscomb met with Dr. Klingler on December 6, 2010, at USM in furtherance of his task.  (*See* Klingler Dep. [39-1] 65:24-66:5; Lipscomb Dep. [39-6] 25:23-26:9.)  Besides Dr. Lipscomb and Dr. Klingler, legal counsel for USM, legal counsel for Dr. Klingler, and Dr. Klingler's wife were present at the meeting.  Dr. Lipscomb provided Dr. Klingler with a copy of a typed statement given by Mr. Hand to Officer Keys on November 23, 2010, regarding the November 9 incident,[4] and Dr. Klingler then advised Dr. Lipscomb of his understanding of the matter.  (*See* Klingler Dep. [39-1] 66:6-12, 73:4-18; Lipscomb Dep. [39-6] 64:17-25.)  Dr. Lipscomb issued a written report to Dr. Blackwell on December 9, 2010, providing the following salient information with respect to the December 6 meeting:

> Of particular concern was a report that he [Dr. Klingler] may have made a statement possibly indicative of the potential of harm to another individual. Dr. Klinger [sic] indicated that he did not know of any such statement that he may have made, and on the advice of University Counsel he was provided with a copy of Mr. Hand's statement to Det. Keyes.  Dr. Klingler and his attorney left the room to review that document.  Upon their return, Dr. Klingler provided an account of the events beginning with a discussion of the online chat sessions from Monday, November 8, and his discussion of the chat logs with Mr. Hand the next morning.   During this account, Dr. Klingler acknowledged that he may have made a statement similar to that reported by Mr [sic] Hand but if he had done so it "was in jest" and that he "certainly was not serious about shooting a student."  He added, "That is ludicrous".

---

[4] (*See* Hand Statement [32-2].)

(Doc. No. [33-4] at p. 2.)  Dr. Klingler contends that both Mr. Hand and Dr. Lipscomb incorrectly reported his comments.  (*See* Klingler Dep. [39-1] 66:6-15.)  Dr. Lipscomb did not reach any conclusion as to what actually occurred between Dr. Klingler and Mr. Hand on November 9.  (*See* Lipscomb Dep. [39-6] 56:20-25, 58:24-59:3.)

USM contends that Dr. Klingler "began sending messages by email and Facebook to students and others requesting that these individuals provide support for him with U.S.M. administration" subsequent to his meeting with Dr. Lipscomb.  (Defs.' Mot. to Dismiss/SJ [31] at p. 11.)  It is undisputed that on January 13, 2011, Dr. Klingler posted a message on Facebook advising, *inter alia*, that he had "been wrongfully accused by a Graduate Assistant . . . [of] threaten[ing] a student with bodily harm with a gun", and requesting support from former students.  (Doc. No. [33].)  Dr. Klingler also posted on Facebook the November 9, 2010 letter from Dr. Blackwell placing him on administrative leave, Mr. Hand's November 23, 2010 statement, and a mock photo seeming to indicate that Dr. Klingler had been booked and arrested by USM Police.  (*See* Doc. Nos. [33-1], [33-2], [33-3].)

On February 18, 2011, Dr. Lyman addressed two letters to Dr. Klingler regarding his employment at USM.  One letter advised Dr. Klingler that his contract of employment for the 2011-12 academic year would not be renewed upon its expiration, and that his employment at USM would terminate at the conclusion "of the academic year ending May, 2012."[5]  (Doc. No. [33-5].)  The other letter relieved Dr. Klingler of his teaching

---

[5] Policy & Bylaw No. 403.0102 of the Board of Trustees of State Institutions of Higher Learning (the "Board of Trustees") requires that written notice of the intention not to renew a tenure track faculty member be furnished "not later than September 1 before

obligations for the remainder of his employment and limited his duties to full time

academic research.  (Doc. No. [33-6].)  Dr. Klingler was further advised that his

continued employment was subject to several restrictions, such as not returning to any

USM campus or initiating contact with any current student.  (Doc. No. [33-6].)  The

following excerpts from Dr. Lyman's deposition appear to supply the rationale for these

decisions:

> Q.    [W]hat was the allegation of the university as an entity, to your knowledge,
>       against Dr. Klingler as of February 2011?
>
> A.    I think -- probably as of February 18, I think there was no active
>       accusation.  I think, as of that time, I think what we had determined -- what
>       I had determined was that Dr. Klingler's performance in instruction was
>       probably such that we did not want to retain him.  And that over the period
>       of time from November until February, he had demonstrated a propensity
>       to involve and engage groups in this issue that we felt should not be
>       involved in it, such as his students, and that we would be better served by
>       his absence from campus; therefore, he was relieved for the remainder of
>       his time at USM from teaching responsibilities and placed on research
>       only.
>
> Q.    Let me break that down.  First of all, are you aware he wasn't even on the
>       campus from November 9?
>
> A.    Absolutely.
>
> Q.    No.  But you said just then, whether you realize it or not, between
>       November and February, you said his actions have been this and this and
>       this.  Well, he had no actions for you to disparage during that time frame.

---

the date of termination of a contract" as to any faculty member with two or more years of
service.  (Doc. No. [35-4].)   Mississippi's state institutions of higher learning, such as
USM, are under the management and control of the Board of Trustees.  *See* Miss.
Const. art. 8, § 213-A; Miss. Code Ann. § 37-101-1.

A.      That's absolutely untrue.  He had electronic presence via Facebook.  He visited a student in the hospital.[6]  He had many actions that we objected to.

Q.      How in the world can you object to him visiting a student in the hospital?

A.      Because he was told not to contact students.

Q.      But you have no authority to tell him that.

A.      I don't see how you can say that.

Q.      What written authority do you have --

        . . . .

A.      When we think someone is potentially or possibly dangerous to the students, we have an obligation to try and protect those students, and a responsible action in accomplishing that is to say, You are prohibited from having any contact with students.

Q.      But the only way you can determine that is to provide some kind of hearing so he can defend himself.  You can't just go and allege something, sir, and and say that's a fait accompli and then, therefore, you're going to be banned forever.  There's no authority for that.

A.      We did not ban him forever based upon the potential for violence.  What he was banned for after February 18 was the fact that he was out agitating.  He had placed Mr. Hand's statement -- police statement on his Facebook page.  He had done any number of things in the face of directions not to do that, and that's the definition of contumacious conduct, which is one of the reasons for determination for cause in the IHL handbook.

Q.      But he wasn't terminated for cause.

A.      He wasn't.  And if you look at some other documents, you can see that was a point of discussion that some were advocating.  And I just mentioned Blackwell and Norton saying that we should terminate the man,

---

[6] A USM Police Department Report [34-2 at ECF p. 52] indicates that on December 30, 2010, Dr. Klingler contacted a former graduate student, who was visiting her mother at Forrest General Hospital, and told her that he was on administrative leave and was not supposed to be speaking with students.

and I said, No.  What we'll do is we'll place him on leave.  He can do his research.  He'll continue to get paid.  He'll have almost a year and a half of continued employment and then we will part ways, mainly because he did not follow instructions, and his teaching performance was problematic. He couldn't manage his contacts with students.

Q.     Teaching, in his annual evaluations, wasn't problematic.

A.     Well, certainly terminating a chat room, his students calling him a joke, making extravagant statements, however serious they were, to Mr. Hand, prior reports on a number of occasions of making female students feel uncomfortable, all of these were indications of a non-optimal teaching performance.

(Lyman Dep. [39-5] 48:4-49:12, 49:19-51:10.)

On February 28, 2011, Dr. Klingler directed two letters to USM officials regarding his employment.  One letter was addressed to Dr. Lyman and provided:  "[I]t would probably be better if our attorneys handled this matter.  Please have the university counsel contact my attorney, Mr. Kim T. Chaze, regarding your letters dated February 18, 2011."  (Doc. No. [33-7].)  The other letter was addressed to Dr. Norton and indicated that Dr. Klingler was filing a grievance pursuant to paragraph "12.2.2 of the Faculty Handbook and especially sub paragraphs a, b, d, and f."  (Doc. No. [33-8] at p. 1.)[7]  In summary, Dr. Klingler complained that he was entitled to a hearing to defend himself if there were any allegations against him; that he objected to USM changing the terms and conditions of his employment; that there was no authority for banning him

---

[7] Faculty employment grievances under section 12.2.2 of the Handbook "apply to: (a) annual performance reviews; (b) pre-tenure reviews; . . . (d) non-renewal of employment of non-tenured faculty; . . . and (f) grievances alleging a violation, misinterpretation or misapplication of a rule, policy or procedure in relation to personnel policies, procedures, or practices including teaching assignments, working hours, release time, general working conditions, nonacademic leave, employment benefits, etc."  (Faculty Handbook [39-18] at § 12.2.2.)

from campus; that his right to become tenured was being taken from him; and, that he demanded a name-clearing hearing.  (*See* Doc. No. [33-8] at pp. 1-2.)

There were numerous communications between counsel for USM and counsel for Dr. Klingler between March and June of 2011 regarding Dr. Klingler's grievance. (*See* Doc. Nos. [34-2 at ECF pp. 67-87, 126-138], [34-7].)  It appears that by late April, the parties contemplated a "global grievance hearing" in which Dr. Klingler's complaints would be addressed by the University Advisory Committee ("UAC")[8] to the exclusion of other grievance procedures specified in the Faculty Handbook.  A hearing date of June 22 was eventually agreed upon, but the parties failed to work out an agreement regarding the specific procedures to be followed as the hearing date neared.  Thus, USM moved forward with a "grievance conference" pursuant to section 12.2.4 of the Faculty Handbook.[9]  Dr. Klingler and his counsel declined to attend the conference because they considered it "a waste of time and money to 'confer' when only Dr. Norton will be present, and we regard such an act as harassment in and of itself."  (Doc. No.

---

[8] The UAC "is composed of two members from each of the College Advisory Committees plus one member from the library."  (Faculty Handbook [39-18] at § 2.11.1.) Each academic college at USM is required to maintain a College Advisory Committee "composed of tenured Associate Professors and tenured Professors elected by secret ballot by the full-time facult[y] . . . ."  (Faculty Handbook [39-18] at § 2.11.2.)

[9] "Upon receipt of a grievance, the departmental personnel committee or department chair will invite the involved parties to a conference at an early date convenient to both parties, in order to attempt to informally resolve the grievance.  At the conclusion of the conference, the chair of the departmental personnel committee/department chair will prepare a written memorandum of the grievance, including any agreement reached, and provide a copy to the involved parties within ten (10) days."  (Faculty Handbook [39-18] at § 12.2.4.)

-10-

[35-2].)  They, nonetheless, submitted certain written materials to be considered by Dr.

Norton at the conference.  The "grievance conference" went forward on June 22, the

date previously agreed upon for the "global grievance hearing."

On July 1, 2011, Dr. Norton submitted a written memorandum to Dr. Blackwell

containing her findings as to Dr. Klingler's grievance.  (*See* Doc. No. [34-3].)  Dr. Norton

concluded:

> After reviewing the documents provided, his grievance letter, considering his
> conduct on 11/9/2010 and his conduct after being placed on administrative
> leave, I find no reason to believe that we could have handled the situation or
> Dr. Klingler in any other way.  At no time does Dr. Klingler accept
> responsibility for any of his actions, nor does he attempt to comply with
> instructions from the Dean or the Provost.

(Doc. No. [34-3] at p. 3.)  On July 15, 2011, Dr. Klingler appealed Dr. Norton's findings

to the College Advisory Committee ("CAC") for the College of Education and

Psychology.  (*See* Doc. No. [39-15 at ECF p. 17].)[10]  The CAC met on August 3, 2011,

and found Dr. Klingler's grievance to be without merit by a vote of four (4) to zero (0).

(*See* Doc. No. [34-4].)  On September 22, 2011, Dr. Klingler appealed the CAC's

determination to Dr. Lyman, in his capacity as Provost.  (*See* Doc. No. [39-15 at ECF p.

24].)[11]  The Interim Provost, Dr. Denis Wiesenburg,[12] subsequently convened the UAC,

who determined:  "1) University procedures were followed and 2) due process was

given."  (Doc. No. [34-5].)  The UAC thus recommended to Dr. Wiesenburg "that nothing

---

[10] Section 12.2.5 of the Faculty Handbook specifies procedures available for
requesting that the CAC review a departmental employment decision.

[11] Section 12.2.6 of the Faculty Handbook specifies procedures available for
requesting that the Provost further review a grievance.

[12] Dr. Lyman resigned from his position as Provost in November of 2011.

further is required."  (Doc. No. [34-5].)  On January 24, 2012, Dr. Wiesenburg advised

Dr. Klingler in writing that he concurred with the UAC's determination and that Dr.

Klingler's grievance was without merit.  (Doc. No. [43-1].)  Dr. Klingler then exhausted

the USM grievance proceedings by appealing Dr. Wiesenburg's decision to the

President, Dr. Saunders.  (*See* Doc. No. [39-15 at ECF p. 1].)[13]  On June 26, 2012, Dr.

Saunders addressed a letter to Dr. Klingler stating:

> This will acknowledge receipt of your appeal from the Provost's decision
> relating to your grievance.  Based upon University policy, I have reviewed the
> grievance appeal and record relating to your grievance.  After a careful
> review of the record before me, I have determined that your grievance does
> not have merit.  Therefore, I concur with the findings of the Provost.

(Doc. No. [34-6].)

USM paid Dr. Klingler's salary and provided benefits, such as health care, until

his final employment contract expired in May of 2012.  (*See* Klingler Dep. [39-1] 45:18-

24, 119:11-18.)

On July 19, 2012, Dr. Klingler brought suit against USM, Dr. Saunders and Dr.

Lyman in the Circuit Court of Forrest County, Mississippi.  (*See* Compl. [32-9].)  The

Complaint asserts, *inter alia*, that the "Plaintiff has been wrongfully and illegally

terminated from his tenure track employment as a Professor at USM effective June 1,

2012."  (Compl. [32-9] at ¶ 7.)  Dr. Klingler seeks recovery under Title 42 U.S.C. § 1983

for alleged violations of his rights to due process and equal protection.  Dr. Klingler also

alleges state law claims of intentional infliction of emotional distress, negligent infliction

---

[13] Section 12.2.7 of the Faculty Handbook specifies procedures available for
appealing the Provost's decision to the President.  Institutional grievances may not be
appealed to the Board of Trustees.  (*See* Faculty Handbook [39-18] at § 12.2.8.)

of emotional distress, breach of implied contract and breach of express contract.

On September 4, 2012, the Defendants removed the proceeding to this Court. (*See* Notice of Removal [1].)  Subject matter jurisdiction is asserted on the basis of federal question jurisdiction, 28 U.S.C. § 1331, and supplemental jurisdiction, 28 U.S.C. § 1367.  On September 20, 2013, the Defendants filed their Motion to Dismiss or, in the Alternative, Motion for Summary Judgment [31].  The motion has been fully briefed and the Court is ready to rule.

## II.  DISCUSSION

### A.    Standard of Review

The Defendants have presented numerous matters outside the pleadings in conjunction with their dispositive motion.  As evidenced above, the Court has considered those matters.  Therefore, the motion will be considered under Federal Rule of Civil Procedure 56.  *See* Fed. R. Civ. P. 12(d); *Young v. Biggers*, 938 F.2d 565, 568 (5th Cir. 1991).

Rule 56 provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Initially, the movant has "the burden of demonstrating the absence of a genuine issue of material fact."  *Cannata v. Catholic Diocese of Austin*, 700 F.3d 169, 172 (5th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).  If the movant meets this burden, the nonmovant must go beyond the pleadings and point out specific facts showing the existence of a genuine issue for trial.  *Id.*  "'An issue is material if its resolution could affect the outcome of the action.'"  *Sierra Club, Inc. v. Sandy Creek*

*Energy Assocs., L.P.*, 627 F.3d 134, 138 (5th Cir. 2010) (quoting *Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001)).  "An issue is 'genuine' if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." *Cuadra v. Houston Indep. Sch. Dist.*, 626 F.3d 808, 812 (5th Cir. 2010) (citation omitted).

The Court is not permitted to make credibility determinations or weigh the evidence.  *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (citing *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007)).  When deciding whether a genuine fact issue exists, "the court must view the facts and the inferences to be drawn therefrom in the light most favorable to the nonmoving party."  *Sierra Club, Inc.*, 627 F.3d at 138.  However, "[c]onclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."  *Oliver v. Scott*, 276 F.3d 736, 744 (5th Cir. 2002) (citation omitted).  Summary Judgment is mandatory "'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Brown v. Offshore Specialty Fabricators, Inc.*, 663 F.3d 759, 766 (5th Cir. 2011) (quoting *Celotex Corp.*, 477 U.S. at 322).

### B.    Federal Claims

Title 42 U.S.C. § 1983 does not provide a general remedy for state law torts or allow access to federal courts for all individuals suffering injuries at the hands of state actors.  *White v. Thomas*, 660 F.2d 680, 683 (5th Cir. 1981).  The statute "affords a remedy only to those who suffer, as a result of state action, deprivation of 'rights,

privileges, or immunities secured by the Constitution and laws' of the United States." *Id.*
(quoting 42 U.S.C. § 1983). To state a cognizable § 1983 claim, "'a plaintiff must (1)
allege a violation of a right secured by the Constitution or laws of the United States and
(2) demonstrate that the alleged deprivation was committed by a person acting under
color of state law.'" *Doe ex rel. Magee v. Covington County Sch. Dist.*, 675 F.3d 849,
854 (5th Cir. 2012) (quoting *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir.
2008)).

### 1. Claims Against USM, Dr. Saunders (in Her Official Capacity) and Dr. Lyman (in His Official Capacity)

States and state agencies are not "persons" subject to suit under § 1983.
*Cheramie v. Tucker*, 493 F.2d 586, 587 (5th Cir. 1974). "[A] suit against a state official
in his or her official capacity is not a suit against the official but rather is a suit against
the official's office" and "is no different from a suit against the State itself." *Will v. Mich.
Dep't of State Police*, 491 U.S. 58, 71, 109 S. Ct. 2304, 105 L. Ed. 2d 45 (1989)
(citations omitted). Accordingly, state employees sued in their official capacities are
also improper defendants in § 1983 actions. *See id.* Nonetheless, a claim for
prospective injunctive relief against a state official, as opposed to a claim for monetary
damages, may be brought under § 1983. *See id.* at 71 n.10 (citing *Kentucky v.
Graham*, 473 U.S. 159, 167 n.14, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985); *Ex parte
Young*, 209 U.S. 123, 159-60, 28 S. Ct. 441, 52 L. Ed. 714 (1908)).

USM is an agency or arm of the State of Mississippi. *See Suddith v. Univ. of S.
Miss.*, 977 So. 2d 1158, 1168 (¶ 12) (Miss. Ct. App. 2007); *accord Salcido v. Univ. of S.
Miss.*, No. 2:11cv173, 2013 WL 2367877, at *2 (S.D. Miss. May 29, 2013); *Nichols v.

*Univ. of S. Miss.*, 669 F. Supp. 2d 684, 693 (S.D. Miss. 2009).  Therefore, USM is

entitled to judgment as a matter of law with respect to Dr. Klingler's assertions of due

process and equal protection violations brought via § 1983.  The same result follows as

to Dr. Klingler's demand for monetary damages under § 1983 against Dr. Saunders and

Dr. Lyman in their capacities as officers of USM.  Dr. Klingler's request for injunctive

relief will be addressed in a subsequent section of this opinion.

> **2.   Claims Against Dr. Saunders and Dr. Lyman in Their Individual
>            Capacities**

Dr. Saunders and Dr. Lyman assert the defense of qualified immunity in

response to Dr. Klingler's constitutional claims brought against them in their individual

capacities.  "Qualified immunity protects public officers from suit if their conduct does

not violate any 'clearly established statutory or constitutional rights of which a

reasonable person would have known.'"  *Prison Legal News v. Livingston*, 683 F.3d

201, 224 (5th Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct.

2727, 73 L. Ed. 2d 396 (1982)).  "'Although nominally an affirmative defense, the plaintiff

has the burden to negate the defense once properly raised.'"  *Poole v. City of

Shreveport*, 691 F.3d 624, 627 (5th Cir. 2012) (quoting *Brumfield v. Hollins*, 551 F.3d

322, 326 (5th Cir. 2008)).  In order to overcome the defense of qualified immunity, the

plaintiff must show:  "(1) the official violated a statutory or constitutional right; and (2) the

right was clearly established at the time of the challenged conduct."  *Khan v. Normand*,

683 F.3d 192, 194 (5th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080, 179

L. Ed. 2d 1149 (2011)), *cert. denied*, 133 S. Ct. 840 (2013).  A constitutional right is

clearly established when it is "sufficiently clear that a reasonable official would

-16-

understand that what he is doing violates that right." *Id.* (citation omitted). Courts have discretion to address the objective reasonableness inquiry first. *See Pearson v. Callahan*, 555 U.S. 223, 236, 129 S. Ct. 808, 172 L. Ed. 2d 565 (2009). The defense of qualified immunity, "even on summary judgment, 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Poole*, 691 F.3d at 627. In addition, the defense alters the summary judgment burden of proof by requiring the plaintiff to evidence a genuine issue of material fact. *See Tolan v. Cotton*, 713 F.3d 299, 304 (5th Cir. 2013) (citing *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005)).

For the reasons discussed below, the Court finds that Dr. Klingler has failed to evince issues for trial as to Dr. Saunders and Dr. Lyman's alleged violation of any constitutional right. Thus, the Court need not consider the objective reasonableness of Dr. Saunders and Dr. Lyman's conduct (the second prong of the qualified immunity analysis), and summary judgment will be granted in favor of these Defendants in their individual capacities on Dr. Klingler's § 1983 claims.

### a.    Due Process

Dr. Klingler alleges violations of his rights to procedural and substantive due process. As to procedural due process, Dr. Klingler contends that he was entitled to a name-clearing hearing; that provisions in USM's Faculty Handbook [39-18] and Employee Handbook [39-20], which were incorporated into his contract of employment, were not followed; and, that he was entitled to a pre-termination hearing and post-termination hearing before unbiased decision makers. Regarding substantive due process, Dr. Klingler contends that he was arbitrarily kept from working, notwithstanding

his employment contract, before any hearing was held regarding Mr. Hand's allegations against him.

The Due Process Clause of the Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law".  U.S. Const. amend. XIV, § 1.  There can be no deprivation of substantive or procedural due process in the absence of a protected property right or liberty interest.  *See, e.g.*, *Johnson v. Rodriguez*, 110 F.3d 299, 308 (5th Cir. 1997); *DePree v. Saunders*, No. 2:07cv185, 2008 WL 4457796, at *7 (S.D. Miss. Sept. 30, 2008), *aff'd*, 588 F.3d 282 (5th Cir. 2009); *Suddith*, 977 So. 2d at 1170 (¶ 19).  "Constitutionally protected property interests are created and defined by understandings that 'stem from an independent source such as state law . . . .'"  *DePree*, 588 F.3d at 289 (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)).  Liberty interests may arise from state law or the Due Process Clause itself.  *See Rhodes v. Thaler*, 713 F.3d 264, 266 n.9 (5th Cir. 2013) (citing *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989)).

Authorities holding that non-tenured faculty members lack protected property rights in re-employment or continued employment are legion.[14]  As explained by the Fifth Circuit in *Whiting*:

Mississippi law is clear that neither state legislation nor state

---

[14] *See, e.g.*, *Roth*, 408 U.S. at 578; *Whiting v. Univ. of S. Miss.*, 451 F.3d 339, 344 (5th Cir. 2006); *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1222 (10th Cir. 2000); *Spuler v. Pickar*, 958 F.2d 103, 107 (5th Cir. 1992); *Chu v. Miss. State Univ.*, 901 F. Supp. 2d 761, 778-79 (N.D. Miss. 2012); *Nichols*, 669 F. Supp. 2d at 694; *Hall v. Bd. of Trs. of State Insts. of Higher Learning*, 712 So. 2d 312, 320 (¶ 31) (Miss. 1998); *Wicks v. Miss. Valley State Univ.*, 536 So. 2d 20, 23 (Miss. 1988); *Suddith*, 977 So. 2d at 1172 (¶ 27).

regulations create a legitimate expectation of continued employment for a non-tenured faculty member:

> Section 37–101–15(f) [Miss. Code Ann.] ... empowers the Board of Trustees to terminate employment contracts at any time for malfeasance, inefficiency or contumacious conduct, but does not create a legitimate expectation of continued employment for a non-tenured employee.

> Just as there is no protected interest which arises from Mississippi statutes, there is none which arises from state regulations.

> Nor does the written tenure policy of MVSU create or confer an expectation of continued employment.

*Wicks v. Miss. Valley State Univ.*, 536 So.2d 20, 23 (Miss.1988) (internal citations omitted).  Furthermore, the Mississippi Supreme Court has held that positive annual reviews do not serve to generate a property interest in tenure. *Id.* at 24 (citing *Staheli v. Univ. of Miss.*, 854 F.2d, 121, 126 (5th Cir.1988)).

451 F.3d at 344-45.

Dr. Klingler's prior employment at USM falls within the general rule stated by the preceding authorities.  No contract has been presented to the Court providing that USM had to establish cause before declining to re-employ Dr. Klingler.  Further, the Faculty Handbook cannot be said to create a reasonable expectation of continued employment for non-tenured faculty.  "[T]he Board is under no legal obligation to renew the contract of any non-tenured employee and may decline to do so for any reason."  (Faculty Handbook [39-18] at § 3.11.5.)  "[T]he annual employment contracts of non-tenured faculty are renewable entirely at the discretion of the Board upon the recommendation of the University President."  (Faculty Handbook [39-18] at § 3.11.6.)  The Court's review of Policy & Bylaw No. 403.0102 of the Board of Trustees, pertaining to notice of non-renewal of tenure track faculty, also fails to disclose any basis for Dr. Klingler's

legitimate expectation of re-employment.  (*See* Doc. No. [35-4].)  This provision merely specifies that a non-renewal notice must be in writing and furnished to a tenure track faculty member within a specified time period prior to the date of termination.  Dr. Lyman's February of 2011 written notice to Dr. Klingler, advising that his employment at USM would not be renewed following the conclusion of the 2011-12 academic year, complied with this provision.  (*See* Doc. No. [33-5].)

Dr. Klingler was not entitled to "a hearing when . . . [USM] declined to renew his contract of employment"[15] or "substantive protection. . . [from] arbitrary . . . government action"[16] given the absence of any protected property interest in his continued employment at USM.  Dr. Klingler's "tenure-track" status fails to alter this result.  *See Suddith*, 977 So. 2d at 1170 (¶ 20) ("[T]he Mississippi Supreme Court has clearly stated that non-tenured faculty, whether they be tenure-track or non-tenure track, do not have a protected property interest in continued employment either by legislation or regulations.") (citations omitted).  USM's February of 2011 decision to limit the scope of Dr. Klingler's employment to academic research, while continuing to provide him with salary and benefits,[17] also fails to implicate the protections of the Due Process Clause.  *Cf. DePree*, 588 F.3d at 289 (affirming the district court's ruling that a *tenured* professor was not deprived of a protected property interest when he was given a full-time research assignment and precluded from teaching and accessing the business school);

---

[15] *Roth*, 408 U.S. at 578.

[16] *Hall*, 712 So. 2d at 320 (¶ 31).

[17] (*See* Doc. No. [33-6].)

*Mollaghan v. Varnell*, 105 So. 3d 291, 304 n.32 (Miss. 2012) (finding plaintiff's claim that he was deprived of due process when he was removed as the head coach of the women's soccer team and reassigned to a teaching position to be without merit), *cert. denied*, 2013 WL 1625136 (Oct. 7, 2013).

The principal authorities relied upon by Dr. Klingler in support of the existence of a property right are inapposite. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985); *Samuel v. Holmes*, 138 F.3d 173 (5th Cir. 1998); *Russell v. Harrison*, 736 F.2d 283 (5th Cir. 1984). In *Loudermill*, an Ohio statute created a property interest in continued employment by requiring "misfeasance, malfeasance, or nonfeasance in office" for the dismissal of civil service employees. 470 U.S. at 538-39 (citing Ohio Rev. Code. Ann. § 124.34). In *Samuel*, a Louisiana statute required "valid reasons" for the dismissal or discharge of non-tenured, probationary school board employees. 138 F.3d at 176 (citing La. Rev. Stat. Ann. § 17:522). No comparative Mississippi statute addressing the renewal of employment of non-tenured faculty members has been brought to the Court's attention. Protected property rights were implicated in *Russell* when plaintiffs' one-year employment contracts were prematurely terminated. 736 F.2d at 285, 287. Dr. Klingler was not terminated prior to the expiration of any employment contract. His employment ended upon the expiration of his contract for the 2011-12 academic year,[18] and USM was under no duty to re-employ him.

---

[18] (*See* Doc. No. [33-5].)

The freedom to work and earn a living falls within the scope of the liberty interests protected by the Due Process Clause.  *See Roth*, 408 U.S. at 572.  Thus, the right to procedural due process is implicated when a governmental "employee is discharged in a manner that creates a false and defamatory impression about him and thus stigmatizes him and forecloses him from other employment opportunities."  *Bellard v. Gautreaux*, 675 F.3d 454, 461 (5th Cir. 2012) (citation and internal quotation marks omitted); *see also Hall*, 712 So. 2d at 322 (¶ 34) ("[W]here arbitrary and capricious government action results in damage to a public employee's reputation such as to foreclose the employee's future employment opportunities there may be a deprivation of liberty.").  A claimant must show the following in order to establish a due process violation for the denial of a name-clearing hearing:

> (1) he was discharged; (2) stigmatizing charges were made against him in connection with the discharge; (3) the charges were false; (4) he was not provided notice or an opportunity to be heard prior to the discharge; (5) the charges were made public; (6) he requested a hearing to clear his name; and (7) the employer denied the request.

*Bellard*, 675 F.3d at 461-62.

Dr. Klingler's allegation that his right to due process was violated in the absence of a name-clearing hearing fails on the first, fourth, fifth and seventh of the above-quoted elements.[19]  "First, he was not terminated, but was non-renewed after being allowed to finish his contractual term, thus failing to meet element (1)."  *Nichols*, 669 F. Supp. 2d at 696 (finding that the defendants were not constitutionally required to

---

[19] No judgment is rendered as to Dr. Klingler's ability to meet the remaining elements.

provide the plaintiff with a name-clearing hearing).

The following circumstances, occurring prior to Dr. Klingler's last day of employment in May of 2012, preclude a finding in his favor on the fourth and seventh required elements.  On November 9, 2010, Dr. Klingler was advised in writing that he was being placed on administrative leave due to "allegations of potential harm to others."  (Doc. No. [32-5].)  On December 6, 2010, Dr. Lipscomb met with Dr. Klingler and his attorney and provided them with a copy of Mr. Hand's statement, including allegations that Dr. Klingler invaded the personal space of female graduate students and stated on November 9 that "I have never shot a student and what that girl said does not bother me, but I think about it and I think about it a lot."  (*See* Hand Statement [32-2] at pp. 1-2; Klingler Dep. [39-1] 65:25-66:12, 73:4-18; Lipscomb Dep. [39-6] 64:17-25.)  On May 9, 2011, legal counsel for USM communicated to Dr. Klingler's counsel the availability of a global grievance hearing before the UAC, less two representatives from Dr. Klingler's college, with appeals available to the Provost and the President.  (*See* Doc. No. [34-2 at ECF p. 78].)[20]  On June 6, 2011, counsel for USM transmitted to Dr. Klingler's counsel numerous documents regarding:  (a) the incident involving Mr. Hand; (b) Dr. Klingler posting Mr. Hand's statement and related matters on Facebook; and, (c) a complaint from a former graduate student to USM Police concerning her interactions with Dr. Klingler at Forrest General Hospital on December 30, 2010.  (*See* Doc. No. [34-2 at ECF pp. 87-125].)  Dr. Klingler's counsel subsequently reviewed the documents

---

[20] This was subsequent to the transmission of Dr. Klingler's February of 2011 formal grievance notice, including a demand for "a name clearing hearing."  (Doc. No. [33-8] at p. 2.)

and advised that Dr. Klingler would not be attending the subject hearing because, *inter alia*, "[t]he end result is that the deck is stacked against Dr. Klingler." (Doc. No. [34-2 at ECF p. 126].)  Dr. Klingler was still afforded the opportunity to state his case at a grievance conference before Dr. Norton on June 22, 2011, pursuant to section 12.2.4 of the Faculty Handbook.  However, Dr. Klingler and his counsel declined to attend the conference because they considered it  "a waste of time and money . . . ." (Doc. No. [35-2].)  Dr. Klingler's multifaceted grievance was subsequently heard on paper by Dr. Norton, the CAC, the UAC, and Interim Provost Dr. Wiesenburg.  (*See* Doc. Nos. [34-3], [34-4], [34-5], [43-1]; Faculty Handbook [39-18] §§ 12.2.4, 12.2.5, 12.2.6.)  No reasonable jury could conclude that Dr. Klingler was deprived of notice of the charges against him or the opportunity to contest those charges and clear his name under this set of facts.

Lastly, no showing has been made that Dr. Saunders or Dr. Lyman made the charges against Dr. Klingler "public in any official or intentional manner . . . ." *Nichols*, 669 F. Supp. 2d at 696 (citation omitted).  Respondeat superior liability is unavailable under § 1983.  *See Oliver*, 276 F.3d at 742 (citations omitted).  Thus, neither Dr. Saunders nor Dr. Lyman can be held liable for any other USM employee's public disclosure of the subject charges.  *Cf. Bellard*, 675 F.3d at 462 ("Because this claim is against the Sheriff in his individual capacity . . . [the plaintiff] must show that the Sheriff personally publicized the defamatory statements."); *Nichols*, 669 F. Supp. 2d at 697 (refusing to assign "the duty of rumor control" to the defendants).  Furthermore, absent from the summary judgment record is any evidence of Dr. Saunders or Dr. Lyman creating or "implementing a policy that" was "the moving force" behind the public

-24-

disclosure of the subject charges.  *Oliver*, 276 F.3d at 742 (citing *Grandstaff v. City of Borger*, 767 F.2d 161, 169, 170 (5th Cir. 1985)).  The Court would also be remiss to overlook Dr. Klingler's Facebook postings of Dr. Blackwell's letter placing him on administrative leave and Mr. Hand's fairly disparaging statement.  (*See* Doc. Nos. [33-1], [33-2].)  Dr. Klingler understood that a Facebook "friend" could forward his posts to anyone of his or her choosing.  (*See* Klingler Dep. [39-1] 74:19-75:1.)  Self-publication fails to satisfy the essential element of public disclosure in the Fifth Circuit.  *See Bellard*, 675 F.3d at 462; *Hughes v. City of Garland*, 204 F.3d 223, 228 (5th Cir. 2000).  In sum, Dr. Klingler's inability to make a sufficient showing on several of the essential elements of his claim for denial of a name-clearing hearing mandates summary judgment against him.  *See Brown*, 663 F.3d at 766.

It is doubtful that any of Dr. Klingler's due process claims, substantive or procedural, survive the preceding findings.  Nonetheless, the Court will separately consider Dr. Klingler's allegations of biased decision makers and contract-property rights stemming from employment handbooks assuming, *arguendo*, that these allegations may be construed to escape the foregoing analysis.

The Fifth Circuit has recognized that "Mississippi courts have held that employee manuals become part of the employment contract, creating contract rights to which employers may be held, such as Dr. Whiting's right to the procedures outlined in the handbooks."  *Whiting*, 451 F.3d at 345-46 (citing *Robinson v. Bd. of Trs. of E. Cent. Junior Coll.*, 477 So. 2d 1352, 1353 (Miss. 1985); *Bobbitt v. Orchard Dev. Co.*, 603 So. 2d 356, 361 (Miss. 1992)).  Dr. Klingler focuses on this statement in arguing that the Faculty Handbook [39-18] and Employee Handbook [39-20] were incorporated into his

-25-

written contract of employment and gave rise to protected property interests.[21]  Thus,

according to Dr. Klingler, the Due Process Clause was implicated when he was denied

tenure track evaluations specified in the Faculty Handbook, and when his grievance

proceedings exceeded the time lines specified in the Faculty Handbook and Employee

Handbook.

The problem for Dr. Klingler is that "[it] matters what the handbook actually says"

under Mississippi law.  *Suddith*, 977 So. 2d at 1171-72 (¶¶ 25-27) (affirming the

dismissal of due process claims remarkably similar to those asserted by Dr. Klingler).

Both the Faculty Handbook and Employee Handbook contain disclaimers advising that

the handbook provisions do not give rise to contractual rights.[22]  The Mississippi

Supreme Court has consistently held that employee handbooks expressly disclaiming

the existence of a contract fail to give rise to contractual obligations between employers

and employees.[23]  "When there is something in the employee handbook disclaiming a

---

[21] Dr. Klingler ignores the Fifth Circuit's actual holding on this issue:  "[E]ven *if Dr. Whiting's contractual rights are sufficient to constitute a property interest warranting due process protection*, it is not clear that she has adequately alleged any sort of deprivation.  Indeed, reviewing the history of her tenure application suggests that she has been afforded the processes guaranteed her."  *Id.* at 346 (emphasis added).

[22] "Although the *Faculty Handbook* is not a comprehensive, self-contained policy document, *nor is it a contract of employment*, it does provide guidance for the relationships between the University and the faculty."  (Faculty Handbook [39-18 at ECF p. 1]) (second emphasis added).  "These policies are intended only to be guidelines for employment at USM, and they do not give rise to any contractual rights."  (Employee Handbook [39-20 at ECF p. 2].)

[23] *See, e.g.*, *Byrd v. Imperial Palace of Miss.*, 807 So. 2d 433, 437-38 (¶¶ 17-18) (Miss. 2001); *Lee v. Golden Triangle Planning & Dev. Dist., Inc.*, 797 So. 2d 845, 848 (¶¶ 7-12) (Miss. 2001); *Hartle v. Packard Elec., a Div. of Gen. Motors Corp.*, 626 So. 2d 106, 109-10 (Miss. 1993).

contract of employment, the rule developed in *Bobbitt* does not apply." *Lee*, 797 So. 2d at 848 (¶ 11) (citation and internal quotation marks omitted).  Therefore, the Defendants' alleged failures to follow certain provisions in the Faculty Handbook [39-18] and Employee Handbook [39-20] do not amount to a breach of contract, resulting in the deprivation of a protected property interest.

Even if the subject handbooks gave rise to enforceable contractual obligations, Dr. Klingler still had no protected property interest in continued employment at USM. "Written tenure policies do not, of themselves, create or confer an expectation of continued employment." *Whiting v. Univ. of S. Miss.*, 62 So. 3d 907, 919 (¶ 29) (Miss. 2011)[24] (citing *Wicks*, 536 So. 2d at 23). The "grant of tenure is within the sole discretion of the Board" of Trustees. *Id.*; *see also Whiting*, 451 F.3d at 346 ("[T]he final decision on tenure remains at the discretion of the Board of Trustees, notwithstanding the results of annual and third-year evaluations.").  Furthermore, the Board of Trustees "is under no legal obligation to renew the contract of any non-tenured employee and may decline to do so for any reason."  (Faculty Handbook [39:18] at § 3.11.5.)  Since Dr. Klingler had no legitimate expectation of continued employment beyond the expiration of his one-year employment contract, his reliance on USM's tenure track policies for the existence of a property right is without merit.[25]

---

[24] This decision addressed Dr. Whiting's state law claims after the Fifth Circuit affirmed the district court's dismissal of her federal claims in *Whiting*, 451 F.3d 339.

[25] *Cf. Whiting*, 451 F.3d at 346 (rejecting Dr. Whiting's argument "that the tenure and promotion procedures [in the Faculty Handbook] create a *de facto* tenure program such that she has a protected interest in her continued employment"); *Suddith*, 977 So. 2d at 1172 (¶ 26) (finding that the Faculty Handbook's reference to a "Third Year Review" during the six-year tenure track schedule failed to establish "a tenure-track employee's

Any alleged infractions of the timing deadlines for Dr. Klingler's grievance proceedings similarly fail to reach constitutional significance. *See Mollaghan*, 105 So. 3d 291. In *Mollaghan*, two former USM soccer coaches alleged violations of their rights to procedural due process due to USM's refusal to provide them with a hearing and/or investigation on their grievances in accordance with USM's staff handbook. *Id.* at 303-04 (¶¶ 29-30). The Mississippi Supreme Court assumed *arguendo* that the coaches were entitled to a hearing on their grievances, but found no violation of due process since the coaches' employment contracts were not prematurely terminated and both coaches were fully compensated under their contracts. *Id.* at 304 (¶¶ 30-31). As neither coach suffered any property loss under his contract, neither could "show the deprivation of a property right or that he suffered any compensable damage as the result of his alleged deprivation of procedural due process." *Id.* at (¶ 31). Here too, Dr. Klingler cannot show the deprivation of a property right since he was fully compensated through the expiration of his final employment contract, terminating in May of 2012. (*See* Klingler Dep. [39-1] 45:18-24, 119:11-18.)

Dr. Klingler also contends that he was deprived of the right to unbiased decision makers at USM. Constitutional due process requires fair and impartial decision makers. *See Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 511 (5th Cir. 2001) (citing *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955)). This requirement applies in proceedings before courts, administrative agencies and government hearing officers. *See Valley v. Rapides Parish Sch. Bd.*, 118 F.3d 1047,

---

entitlement to continued employment for the amount of time necessary to reach these stages of the tenure process").

1052 (5th Cir. 1997) (citing *Gibson v. Berryhill*, 411 U.S. 564, 569, 93 S. Ct. 1689, 36 L. Ed. 2d 488 (1973)).  The Supreme Court has provided the following examples of constitutionally unacceptable decision makers:  (1) a decision maker who has a pecuniary interest in the outcome of the case; (2) a decision maker who has been the target of personal abuse or criticism from the claimant; and (3) a decision maker who both investigates and adjudicates complaints.  *Ford Motor Co.*, 264 F.3d at 511-12 (citations omitted).  Dr. Klingler's allegation that the "Defendants 'convicted' . . . [him] before any hearing was held or provided" appears to touch upon the third class of decision makers.  (Pl.'s Mem. Brief in Supp. of Resp. to Mot. for SJ [40] at p. 25.)  As to this class, Dr. Klingler "must overcome two strong presumptions:  (1) the presumption of honesty and integrity of the adjudicators; and (2) the presumption that those making decisions affecting the public are doing so in the public interest."  *Ford Motor Co.*, 264 F.3d at 512 (citing *Valley*, 118 F.3d at 1052-53.)  Bias may be inferred if "evidence is presented to indicate that a hearing officer's mind was irrevocably closed."  *Baran v. Port of Beaumont Navigation Dist. of Jefferson County Tex.*, 57 F.3d 436, 446 (5th Cir. 1995) (citations omitted).  "[M]ere speculation and tenuous inferences" are insufficient to establish unconstitutional bias.  *Tex. Faculty Ass'n v. Univ. of Tex. at Dallas*, 946 F.2d 379, 388 (5th Cir. 1991) (citing *Duke v. N. Tex. State Univ.*, 469 F.2d 829, 834 (5th Cir. 1972)).

        No evidence has been presented to the Court indicating that Dr. Saunders and Dr. Lyman's minds were irrevocably closed prior to their respective employment decisions.  The summary judgment record shows that Dr. Saunders and Dr. Lyman had minimal communications concerning Dr. Klingler, and that Dr. Saunders was not

involved in the initial decision to remove Dr. Klingler from campus.  (*See* Saunders Dep. [39-4] 8:22-9:17, 20:12-14, 23:20-25:9; Lyman Dep. [39-5] 8:17-21, 19:12-22, 38:2-21.) Dr. Lyman testified that around February, 2011, he advised Dr. Saunders "of the broad outlines of the case":  that there was an issue with a faculty member who made a statement that was investigated as a threat; that "we're moving forward on a non-renewal of his contract"; and, that the faculty member had been banned from campus. (Lyman Dep. [39-5] 38:3-21.)  Dr. Saunders recalled being told by Dr. Lyman "that there was complaint from a student that there was -- and this is my memory -- that the student felt threatened and unsafe."  (Saunders Dep. [39-4] 24:22-25.)  Based on this record, it does not appear that Dr. Saunders actually investigated the allegations regarding Dr. Klingler, and only speculation and conjecture support the inference that Dr. Saunders irreversibly made up her mind regarding the allegations prior to her June of 2012 determination that Dr. Klingler's grievance lacked merit.  (*See* Doc. No. [34-6].)

It does appear that Dr. Lyman was involved in the investigation of the allegations against Dr. Klingler and the decision to remove him from campus on November 9, 2010. (*See* Lyman Dep. [39-5] 27:5-10, 29:4-13.)  Further, Dr. Lyman indicated at deposition that he made the February of 2011 decision to limit Dr. Klingler's employment to academic research and not to renew his employment beyond the 2011-12 academic year.  (*See* Lyman Dep. [39-5] 50:17-51:2.)  However, the Court finds Dr. Klingler's conclusory allegations and unsubstantiated assertions of bias on the part of Dr. Lyman insufficient to overcome "the presumption of [Dr. Lyman's] honesty and integrity" and the presumption that Dr. Lyman's decisions were made "in the public interest."  *Ford Motor Co.*, 264 F.3d at 512; *see also Oliver*, 276 F.3d at 744 ("Conclusional allegations

and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial.").  Moreover, Dr. Lyman cannot be said to have made an irrevocable determination about the November 9 incident involving Mr. Hand and Dr. Klingler on that date given his testimony that by February of 2011, he had determined there was no real threat of violence and that Dr. Klingler's teaching duties were not being renewed in large part because of his conduct between November, 2010 and February, 2011.  (*See* Lyman Dep. [39-5] 48:7-19, 76:25-77:8.)  Dr. Lyman also testified that he disagreed with Dr. Norton and Dr. Blackwell's preferences for the immediate termination of Dr. Klingler, which militates against any conclusion that he was somehow out to get Dr. Klingler and prejudiced against him.  (*See* Lyman Dep. [39-5] 50:16-51:2.)

For all the foregoing reasons, Dr. Klingler's due process claims against Dr. Saunders and Dr. Lyman in their individual capacities will not proceed to trial.

### b. Equal Protection

The Equal Protection Clause of the Fourteenth Amendment provides that no State shall "deny to any person within its jurisdiction the equal protection of the law." U.S. Const. amend. XIV, § 1.  Dr. Klingler contends that fact issues exist as to the difference in the Defendants' treatment of him and former Athletic Director Jeff Hammond, who purportedly made threats of violence in the workplace.  Dr. Klingler does not allege that he was discriminated against because of his membership in a specific group or class.

-31-

The Court finds that Dr. Klingler is, in essence, asserting a class-of-one equal protection claim:  "a claim that the State treated an employee differently from others for a bad reason, or for no reason at all".  *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 606, 128 S. Ct. 2146, 170 L. Ed. 2d 975 (2008).  In *Engquist*, the Supreme Court held that such a claim has no application in the context of public employment.  *Id.* at 598. The Court explained:

> [W]e are guided, as in the past, by the "common-sense realization that government offices could not function if every employment decision became a constitutional matter."  *Connick, supra*, at 143, 103 S.Ct. 1684.  If, as Engquist suggests, plaintiffs need not claim discrimination on the basis of membership in some class or group, but rather may argue only that they were treated by their employers worse than other employees similarly situated, any personnel action in which a wronged employee can conjure up a claim of differential treatment will suddenly become the basis for a federal constitutional claim.  Indeed, an allegation of arbitrary differential treatment could be made in nearly every instance of an assertedly wrongful employment action—not only hiring and firing decisions, but any personnel action, such as promotion, salary, or work assignments—on the theory that other employees were not treated wrongfully.  *See* 478 F.3d, at 995.

*Id.* at 607-08.  *Engquist* requires the dismissal of Dr. Klingler's claim of unequal treatment in state government employment.

### 3.    Injunctive Relief

Dr. Klingler argues that two forms of injunctive relief are available against USM and its officers:  (1) the reinstatement of his employment or, at a minimum, (2) the provision of a due process name-clearing hearing.  The Supreme Court has stated that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'"  *Will*, 491 U.S. at 71 n.10 (citations omitted). However, § 1983 only affords a remedy for the violation of federal rights.  *See White*,

-32-

660 F.2d at 683.  The Court has found that there are no issues for trial as to the alleged

violation of Dr. Klingler's federally protected rights.  As a result, neither monetary nor

injunctive relief is available to Dr. Klingler under § 1983.  *Cf. Dooley v. Fort Worth Indep.*

*Sch. Dist.*, 686 F. Supp. 1194, 1200 (N.D. Tex. 1987) ("Absent a violation of

constitutional rights, section 1983 provides no independent basis for recovery or

injunctive relief."), *aff'd*, 866 F.2d 1418 (5th Cir. 1989).

      **C.**      **State Law Claims**[26]

      Defendants contend that they "are entitled to judgment as a matter of law on all

state law claims presented by the Plaintiff."  (Dfs.' Mem. Brief in Supp. of Mot. to

Dismiss/SJ [36] at p. 12.)  Defendants argue that there was no breach of contract since

USM complied with all of its contractual obligations.  Defendants further raise certain

protections available under the Mississippi Tort Claims Act ("MTCA"), Miss. Code Ann.

§§ 11-46-1 to -23, with respect to Dr. Klingler's remaining allegations of intentional

infliction of emotional distress, negligent infliction of emotional distress, and breach of

implied contract.

      The "MTCA provides the exclusive civil remedy for tort actions against the state,

---

[26] Although Dr. Klingler's federal claims are no longer viable, the Court exercises its discretion to retain supplemental jurisdictional over his state law claims in order to rule on summary judgment.  *See* 28 U.S.C. § 1367.  Dr. Klingler has not raised any objection to the Court ruling on his state law claims in the event of the dismissal of his federal causes of action.  Further, the late stage of this proceeding warrants the retention of jurisdiction in this forum.  *See Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 602 (5th Cir. 2009) ("Our case law is clear that when a district court declines to exercise jurisdiction over remaining state law claims following the dismissal of all federal-law claims and remands a suit after investing a significant amount of judicial resources in the litigation . . . , that court has abused its discretion under 28 U.S.C. § 1367.") (citations omitted).

its political subdivisions, and its employees." *City of Jackson v. Harris*, 44 So. 3d 927, 932 (¶ 23) (Miss. 2010) (citing Miss. Code Ann. § 11-46-7(1)).  The Mississippi Supreme Court has held that a claim for breach of an implied contract falls within the scope of the MTCA, while a claim for breach of an express contract does not.  *See Weible v. Univ. of S. Miss.*, 89 So. 3d 51, 60 (¶ 25) (Miss. Ct. App. 2011) (citing *City of Jackson v. Estate of Stewart ex rel. Womack*, 908 So. 2d 703, 710-11 (¶¶ 35-36) (Miss. 2005)).  The Court will separately address Dr. Klingler's express and implied contract claims in accordance with this dichotomy.

Governmental employees, such as Dr. Saunders and Dr. Lyman, may be sued in their official capacity under the MTCA, "but no employee shall be held personally liable for acts or omissions occurring within the course and scope of the employee's duties." Miss. Code Ann. § 11-46-7(2).  A governmental employee shall not be considered to have acted "within the course and scope of his employment and a governmental entity shall not be liable or be considered to have waived immunity for any conduct of its employee if the employee's conduct constituted fraud, malice, libel, slander, defamation or any criminal offense."  *Id.*  "The Mississippi Supreme Court has held that torts which require proof of malice as an essential element are excluded from the MTCA . . . ." *Weible*, 89 So. 3d at 64 (¶ 40) (considering the plaintiff's intentional infliction of emotional distress claim to fall outside the scope of the MTCA, and citing *Zumwalt v. Jones County Board of Supervisors*, 19 So.3d 672, 688-89 (¶¶ 83-84, 86) (Miss. 2009), which found that the MTCA did not apply to a claim for tortious interference with

business relations).[27]  Dr. Klingler's intentional infliction of emotional distress claim includes an allegation of malice,[28] and such a claim may be predicated on behavior that "is *malicous*, intentional, willful, wanton, grossly careless, indifferent or reckless." *Franklin Collection Serv., Inc. v. Kyle*, 955 So. 2d 284, 290 (¶ 20) (Miss. 2007) (emphasis added; citation omitted).  Therefore, this claim will be considered outside of the MTCA.  The remaining alleged tort of negligent infliction of emotional distress indisputably falls within the scope of the MTCA.

### 1.      Breach of Express Contract

A plaintiff must prove the following essential elements in order to prevail on a breach of contract claim:  (1) the existence of a valid and binding contract; and (2) that the defendant has broken or breached the contract.  *Bus. Commc'ns, Inc. v. Banks*, 90 So. 3d 1221, 1224-25 (¶¶ 10-11) (Miss. 2012).  USM paid Dr. Klingler's salary and provided him with benefits through the expiration of his final employment contract, terminating in May of 2012.  (*See* Klingler Dep. [39-1] 45:18-24, 119:11-18.)  No contract has been presented to the Court indicating that USM was precluded from limiting Dr. Klingler's duties to academic research during his employment.  The Faculty

---

[27] *See also Mawson v. Univ. of Miss. Med. Ctr.*, No. 3:11cv574, 2012 WL 6649323, at *5 (S.D. Miss. Dec. 20, 2012) (holding that UMMC was immune from the plaintiff's intentional infliction of emotional distress claim since it was specifically predicated on malicious conduct).

[28] "Irrespective of the breaches of contract, the conduct of Defendants, in and of itself, independent of the contractual situation, was so egregious, *malicious*, outrageous, and venal and/or showed a callous indifference to the consequences that the tort of intentional infliction of emotional distress has been inflicted upon the Plaintiff."  (Compl. [32-9] at ¶ 33) (emphasis added).

Handbook [39-18] and Employee Handbook [39-20], which Dr. Klingler principally relies on for his breach of contract allegations, contain disclaimers advising that the handbook provisions do not give rise to contractual rights.  Mississippi law is clear that reliance on an employment manual containing a valid disclaimer in support of a breach of contract claim is misplaced.  *See, e.g., Byrd*, 807 So. 2d at 437-38 (¶¶ 17-18); *Lee*, 797 So. 2d at 848 (¶¶ 7-12); *Hartle*, 626 So. 2d at 109-10.  For all of these reasons, there is no genuine issue of material fact as to any alleged breach of contract and summary judgment against Dr. Klingler is due on this claim for relief.

### 2.    Intentional Infliction of Emotional Distress

An action for intentional infliction of emotional distress requires the defendant's "conduct to be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Raiola v. Chevron U.S.A., Inc.*, 872 So. 2d 79, 85 (¶ 23) (Miss. Ct. App. 2004) (citation omitted).  Liability will not attach for mere insults, threats, indignities, petty oppression, annoyances, or other trivialities.  *Jones v. Mullen*, 100 So. 3d 490, 499 (¶ 40) (Miss. Ct. App. 2012) (citing *Clark v. Luvel Dairy Prods., Inc.*, 821 So. 2d 827, 831 (¶ 9) (Miss. Ct. App. 2001)).  The claimant must show that the defendant intentionally and maliciously sought to do him harm.  *Sumler v. East Ford, Inc.*, 915 So. 2d 1081, 1089 (¶ 26) (Miss. Ct. App. 2005) (citing *Morgan v. Greenwaldt*, 786 So. 2d 1037 (¶ 24) (Miss. 2001)).  Furthermore, employment disputes will not ordinarily support an emotional distress claim.  *Lee*, 797 So. 2d at 851 (¶ 24) (citations omitted).  "Only in the most unusual cases does the conduct move out of the 'realm of an ordinary employment dispute' into the classification of 'extreme and outrageous,' as

required for the tort of intentional infliction of emotional distress." *Brown v. Inter-City Fed. Bank for Savings*, 738 So. 2d 262, 265 (¶ 9) (Miss. Ct. App. 1999) (citing *Prunty v. Ark. Freightways, Inc.*, 16 F.3d 649, 654 (5th Cir. 1994)).

Viewing the facts and resulting inferences in Dr. Klingler's favor, while giving the pleadings and arguments of Dr. Klingler's counsel the limited weight they are due,[29] the Court determines that no reasonable jury could find that Dr. Saunders or Dr. Lyman engaged in conduct so outrageous and extreme in character as to be intolerable in a civilized society.  At bottom, this is an ordinary employment dispute, albeit in a public setting.  Thus, this claim will also be dismissed.

### 3.    Negligent Infliction of Emotional Distress and Breach of Implied Contract

Dr. Saunders and Dr. Lyman contend that they are immune from liability under section 11-46-9(1)(d) of the MTCA "since their actions involved an act of choice or judgment involving the important public policy of providing students in the state university with the best possible faculty member."  (Defs.' Mem. Brief in Supp. of Mot. to Dismiss/SJ [36] at p. 12.)  Section 11-46-9(1)(d) exempts governmental entities and their employees acting within the course and scope of their employment from liability for any claim founded "upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a governmental entity or

---

[29] It is well established that arguments of counsel and unsworn allegations in the pleadings fail to preclude summary judgment.  *See, e.g.*, *Nettles v. Travelers Prop. Cas. Ins. Co.*, 375 F. Supp. 2d 489, 492 (S.D. Miss. 2005); *Roberts v. Walthall County Gen. Hosp.*, 96 F. Supp. 2d 559, 561 (S.D. Miss. 2000), *aff'd*, 240 F.3d 1075 (5th Cir. 2000).

employee thereof, whether or not the discretion be abused". Miss. Code Ann. § 11-46-9(1)(d). Several authorities have found section 11-46-9(1)(d) applicable to employment decisions made by government officials. *See, e.g.*, *Patton v. Hinds County Juvenile Det. Ctr. (Henley-Young)*, No. 3:10cv138, 2011 WL 2912897, at *6 (S.D. Miss. July 18, 2011) ("Employment decisions, like that about which Patton complains, are classic discretionary functions . . . since they require 'personal deliberation, decision and judgment.'"); *DePree*, 2008 WL 4457796, at *9 ("An employment decision is a classic discretionary function."); *Suddith*, 977 So. 2d at 1179 (¶¶ 48-49) (holding that the decision to offer a professor a one-year contract of employment, as opposed to a tenure track position, was a discretionary act immune from liability under the MTCA).

The Court discerns no argument, persuasive or otherwise, from Dr. Klingler as to the inapplicability of section 11-46-9(1)(d) to his negligent infliction of emotional distress and breach of implied contract causes of action. No showing has been made that Dr. Saunders and Dr. Lyman were acting outside the course and scope of their employment when they made their respective decisions regarding Dr. Klingler.[30] Further, these Defendants' decisions required the exercise of judgment (as opposed to the straightforward execution of a statutory mandate) and involved the "public policy" of providing students at USM "with the best faculty members possible." *Suddith*, 977 So. 2d at 1179 (¶ 49). Consequently, all of the Defendants are immune from these claims under the MTCA.

## III. CONCLUSION

---

[30] This circumstance precludes any individual liability pursuant to section 11-46-7(2).

-38-

The Court concludes that there is no genuine issue as to any material fact and the Defendants are entitled to judgment as a matter of law on all of Dr. Klingler's claims.

IT IS THEREFORE ORDERED AND ADJUDGED that the Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment [31] is granted and Plaintiff's Complaint is dismissed with prejudice.  Any other pending motion is denied as moot.  A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

SO ORDERED AND ADJUDGED this the 5th day of December, 2013.


*s/ Keith Starrett*
UNITED STATES DISTRICT JUDGE